**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE MITCHELL GOLD CO., LLC, *et al.*,[1] | Case No. 23-11385 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF DALTON EDGECOMB IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Dalton Edgecomb, hereby declare as follows:

1.      I am the Chief Restructuring Officer of debtors The Mitchell Gold Co., LLC, ("MG") and SG-TMGC, LLC ("SG-TMGC" and, collectively with MG, the "Debtors").  In my time with the Debtors, I have become familiar with the Debtors' business, day-to-day operations, financial affairs, and books and records.

2.      On August 31, 2023, SG-TMGC filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the District of Delaware, Case No. 23-11364.

3.      On September 6, 2023 (the "Petition Date"), MG filed a voluntary petition for relief under the Bankruptcy Code.  The Debtors have filed several motions seeking interim and final relief.  I submit this declaration (the "Declaration") in support of the relief sought, as well as to provide details on the Debtors' background and the events leading up to these chapter 11 cases.

---

[1]      The Debtors in these chapter 11 cases, along with the Debtors' federal tax identification numbers are: The Mitchell Gold Co., LLC (8942) and SG-TMGC, LLC (0248).  The Debtors' addresses are, respectively, 135 One Comfortable Place, Taylorsville, North Carolina 28681 and P.O. Box 3417, Little Rock, Arkansas 72203.

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team, employees and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**I.  Overview and Summary Introduction**

5.      This declaration is a chronicle of the unexpected downfall in operations of a great American company due, to a significant degree, to the restrictive lending tactics and conduct of PNC (as defined below).  MG has, since 1989, been a successful custom furniture manufacturer and distributor, which employed most recently over 800 skilled professionals nationally and achieved almost $200 million in sales over the last year.  Since 2021, MG's day-to-day operational financing model was based exclusively on debt funded by PNC which was secured by MG's assets and cash flow.  In connection with PNC's financing, PNC required full dominion and control of all material cash accounts of MG, and MG was completely dependent on the revolving borrowings from PNC to fund MG's short term ordinary course expenses like wages, vendor accounts, rent, and sales tax obligations.  MG's reliance on cash from PNC's lending facility was exacerbated by the PNC requirement that MG's outstanding debt balance was repaid from daily cash deposits into MG, including significant deposits from MG customers.

6.      Beginning in April 2023, when PNC's outstanding debt to MG was approximately $23 million, MG began reviewing various restructuring, recapitalization, and other acute strategic efforts to take MG's operations to a new level of success compared to troubled operations created by the Covid-19 Pandemic.  On June 26, 2023, in connection with MG's

extraordinary efforts to reposition its operations for a greater trajectory in the marketplace, SG-TMGC infused $20 million of cash into MG.

7.      This capital infusion was predicated on PNC's agreement to provide reasonable credit terms to MG in connection with implementation of MG's reinvigoration plan. PNC agreed to this plan, inducing SG-TMGC to contribute capital, which was then applied to reduce MG's outstanding balance owed to PNC to around $3 million.  The capital infusion was intended to serve as the trigger for the strategic repositioning plan to take MG to its pre-Pandemic levels of operational success.

8.      Within only weeks of applying SG-TMGC's cash infusion to significantly pay down the debt owed by MG, PNC began stonewalling MG's extraordinary efforts to reposition the company operations.  PNC's position was entirely contrary to the understanding of MG and SG-TMGC that PNC would, following the infusion of SG-TMGC's capital, provide a better funding foundation and credit facility terms to MG to assist in MG's strategic market repositioning.  PNC within weeks of the SG-TMGC's cash infusion deployed restrictive lending tactics which placed undue extreme pressure on the management teams of MG and SG-TMGC, and which ultimately caused extraordinary financial stress on MG because MG was entirely reliant on PNC's funding and PNC's control of MG's cash under its debt facility.  MG was unable to access MG's own cash unless PNC permitted access through the debt facility.

9.      On July 14, 2023, only eighteen (18) days following SG-TMGC's funding of MG that inured significantly to PNC's benefit, PNC declared three (3) non-monetary defaults predicated upon technical failures of MG to submit certain continuing reports to PNC, which MG provided to PNC in less than 120 minutes in an attempt to easily deal with the declared defaults. Two (2) of the three (3) alleged non-monetary defaults arose from submission of May

3

financial information from MG which had been previously provided by MG to PNC in connection with SG-TMGC's $20 million cash infusion.

10.      In August 2023, PNC communicated to MG an updated borrowing base template to reflect what PNC called "Assigned Inventory."  According to PNC, the borrowing base was being reduced because PNC's inventory appraisal apparently revealed that approximately $8 million of inventory was "assigned to a customer based on customer deposits received" and was therefore ineligible to be considered in the borrowing base template.  The "assigned inventory" consisted of finished products being held in distribution centers and third-party logistics vendors in anticipation of delivery to customers.  Notably, there was no change in the classifications of inventory provided by the company nor change in the characterization of its inventory.  All this change by PNC served to accomplish was a unilateral decision to remove nearly $8 million from MG's liquidity and further limit PNC's risk, further deteriorating the ability of the company to achieve the plan that the parties bargained for as part of the June 26th recapitalization and amendment to the RCSA. To date, PNC has refused to share a copy of the appraisal with the Debtors, despite the Debtors' requests and even the fact that PNC has shared this appraisal with a third party that has expressed an interest in purchasing the company's assets.

11.      By reducing the borrowing base, declaring these procedural timing defaults, and refusing to permit the objectively reasonable immediate action from MG to provide the financial information, PNC has forced MG into this Chapter 11 proceeding by freezing out MG's access to cash upon which it was totally reliant to continue operating and to implement its reinvigoration plan to take its historic company operations to a new level of success.  The outcome of the proceeding is yet to be known – however, it is likely that PNC's restrictive and improper lending tactics could serve as the catalyst to the downfall of a great American success story, will

damage MG's vendors awaiting payment, has damaged MG's brand and will harm innocent customers awaiting delivery of high-quality custom furniture.

I.      **The Debtors' Business**

12.     Founded in 1989 with a vision to bring comfortable, American-made furnishings to every corner of the country, MG was a vertically integrated manufacturer, distributor and retailer of American-made furniture, home décor, and accessories.  MG manufactured upholstered products in its Taylorsville, North Carolina facility, where it until August 25, 2023, employed hundreds of skilled craftspeople and supporting staff.  MG's products include sofas, sectionals, chaises and lounges, chairs, bedding, rugs, lighting, mattresses, tables, storage, office furniture, wall art, mirrors, and other accessories.  Across the nation, MG employed approximately 800 employees through its factory, distribution center and retail operations.

13.     MG operated approximately twenty-four (24) retail stores under the Mitchell Gold + Bob Williams trade name, a retail website www.mgbwhome.com, thirty-eight (38) virtual stores, and six (6) outlet stores.  At the virtual stores, expert designers met with customers in geographic areas where MG did not have a physical store but was supported with catalogs, samples and tools needed to provide advice and assistance with design projects for its customers in these areas.  Additionally, MG manufactured and  sold certain furniture and related products directly to high quality wholesale customers such as Restoration Hardware, as well as select customers in the hospitality industry.  Attached as **Exhibit A** is a chart listing MG's retail store, virtual store, and outlet store service locations.

14.     MG is a wholly owned subsidiary of SG-TMGC.  SG-TMGC has no operations other than holding the stock of MG.  SG-TMGC is owned by The Stephens Group, LLC (the "Stephens Group") and the Sorrells Joint Revocable Trust.

15.     For fiscal year 2022, MGC had total net sales of approximately $199 million.

## II.     Prepetition Credit Facility and Capital Structure

16.     Prior to July 2021, MG's primary lender was Monroe Capital Management Advisors, LLC ("Monroe") as an agent for certain affiliated participating lenders.  On or about July 9, 2021, the Debtors refinanced their credit arrangements with Monroe such that PNC Bank, National Association ("PNC") as an agent for certain affiliated participating lenders became MG's primary secured lender pursuant to a Revolving Credit and Security Agreement (the "RCSA") dated July 9, 2021.  The relationship manager who had worked with Monroe at the time the financing was entered into with Monroe had subsequently moved to PNC and solicited the business for PNC. The RCSA extended credit facilities initially to MG of up to $25 million and subsequently up to $32 million, secured by a blanket lien on all of MG's assets and membership interests.  On June 26, 2023, SG-TMGC guaranteed the RCSA as a successor in interest to the prior guarantor, Comfort Retail Holdings, Inc. ("CRHI").  The primary purpose of the RCSA was to provide operating capital to MG under an asset-based loan structure, with full cash dominion existing at PNC. As a result of the full cash dominion requirements associated with the RCSA, MG is completely reliant on the RCSA to provide practically all of the cash needed to operate its business on a daily basis and any restriction of a disbursement request by MG would by its very nature disrupt the operations of MG.

17.     As of September 6, 2023, the borrowings under the RCSA totaled $9,717,405.77, including principal, together with any outstanding letters of credit, plus interest accrued and accruing costs, fees and expenses, and all other "Obligations" as defined in the RCSA as amended (collectively the "Prepetition PNC Obligations").

18.     On June 26, 2023, MG completed a recapitalization and executed a Limited Waiver and Fifth Amendment to the RCSA (the "Fifth Amendment") in connection with a transaction in which, pursuant to the terms of the RCSA, PNC swept all the proceeds of a new equity funding by SG-TMGC in the amount of $20 million to pay down the RCSA by an approximately equal amount. The net effect of such funding and pay down of the RSCA was that the balance owed to PNC on June 26 went from over $23 million to only $3,077,806.50.  Prior to the recapitalization, MG's predecessor, The Mitchell Gold, Co., converted to a North Carolina limited liability company.  SG-TMGC purchased the equity of MG from its previous sole owner, CRHI.

19.     SG-TMGC guaranteed the Obligations to PNC pursuant to that certain Joinder Agreement dated June 26, 2023 (the "Joinder").  SG-TMGC pledged its equity interests in MG as collateral for its obligations under the Joinder.  As described below, over approximately the past ninety (90) days, PNC has been repaid approximately $20,000,000 under the RSCA, or $13,360,400.73 net of additional borrowings subsequent to the June 26, 2023, equity funding from SG-TMGC.

20.     Pursuant to the terms of the RCSA, any Prepetition PNC Obligations owed are likely secured by substantially all of the Debtors' property as more fully set forth in the Prepetition Loan Agreements (the "Prepetition Collateral").

21.     Cash receipts from the operation of MG's business were deposited into depository accounts held by PNC, Wells Fargo Bank, N.A., or Bank of America, N.A. It is important to note that "cash receipts" were predominantly cash/checks/credit card transactions that customers paid as deposits for their furniture orders, with the expectation that these orders would be fulfilled by MG in the future.  This is standard operating practice in the custom furniture business.  Substantially all funds were deposited into the PNC Depository Account. The Wells Fargo and Bank of America Depository Accounts were used only for limited instances where cash or check payments by customers could be locally deposited by store managers .  Funds received into the PNC Depository Account are automatically applied against the balance due under the RCSA the next business day.

22.     MG has a receivable services agreement with Milberg Factors, Inc. ("Milberg"), whereby Milberg assists in the collection of wholesale receivables due to MG from certain customers.  In exchange for these collection services and providing a guaranty on the ultimate receipt of payment for these receivables, Milberg earns a fee based on a percentage of amounts collected.  Receipts from receivables collected by Milberg are wired directly by Milberg to a depository account held by PNC once the receipts have a balance of at least $100,000.00.  As of September 6, 2023, the balance in the Milberg account is $64,705.10.  Again, in the ordinary course, this is not remitted to PNC until it exceeds $100,000.00.

23.     The pre-petition operations of MG's business were supposed to be funded through the PNC disbursement accounts.  MG requested advances from PNC daily or weekly as necessary to cover the cash needs of the business as they arose.  Funds were advanced from the RCSA to MG's disbursement accounts, and operations were funded out of these disbursement accounts.  In the normal course, if cash receipts on any given day are greater than disbursement

requests, the RCSA balance would go down, and if cash receipts were less than disbursement requests the RCSA balance would go up.

## III.    Historical Events Leading to Filing

24.    In 2020 the COVID-19 Pandemic (the "Pandemic") occurred, initially having a significant negative impact on all consumer businesses, including MG  Within a few months of the Pandemic settling in, this decline reversed quickly, and MG started to see a significant increase in purchases as its customers spent more and more time at home during the Pandemic.    While demand was strong, Pandemic-related supply chain challenges resulted in industry-wide uncertainties around order planning and materials delivery such that the typical lead times (time from customer order to delivery) for retail customers increased from approximately 6 weeks to 20 weeks or longer.

25.    During the Pandemic and up to the time of the Fifth Amendment, MG's equity holders, including Stephens Group, contributed additional capital to MG, through subordinated indebtedness, totaling $18,500,000 to offset the challenges presented by the Pandemic.

26.    In April 2023, MG hired a new CEO who had the experience needed to address MG's challenges and lead the company back to its historic success.

27.    In mid-April 2023, MG, along with CRHI and its affiliates (the "Equity Investors"), proposed to PNC that the Equity Investors provide additional subordinated loans conditioned on PNC providing additional availability above what was allowed under the then-current terms of the RCSA to jointly address short-term liquidity needs and the longer-term operational restructuring proposed by the new CEO.    Ultimately, PNC declined the request made by the Equity Investors, and in response, the Equity Investors declined to fund PNC's proposal.

After such time, PNC expressed significant frustration that the Equity Investors were not funding additional liquidity and commenced imposing punitive funding conditions on MG. Further, such funding conditions required MG to engage a financial advisor suggested by PNC and further required MG to engage an investment banker to run a process in which MG could solicit indications of interest from parties interested in potentially purchasing MG's equity or assets, or in refinancing PNC's debt. MG shortly thereafter hired Riveron RTS, LLC as its financial advisors upon the recommendation of PNC. The Company also commenced negotiations and discussions with a highly qualified investment bank with deep furniture and consumer brand experience to run an organized process to find a strategic buyer for the business or a financing source to refinance out PNC. PNC expressed confidence that such a buyer or refinancing partner would be identified. However, PNC, with its full cash dominion and now consistent practice of controlling disbursements of MG, rejected the investment bank and process selected by MG due to what PNC considered to be too high of a deposit required by the investment bank to conduct the process. PNC, at this point fully controlling the purse strings, told MG that it wouldn't fund the deposit for the investment bank thus nullifying the process preferred by MG that would maximize the value of the assets. Ultimately, Imperial Capital ("Imperial") was retained with PNC's consent as the investment banker due to its lower cost, and PNC instituted a deadline of three weeks with which to conclude the process with an identified solution to refinance out PNC or sell the assets or equity of the company.

28.     MG, Riveron and Imperial all realized the deadline imposed by PNC would naturally exclude the most logical and strategic buyers of the assets or equity or an orderly refinancing in favor of participants primarily accustomed to acting in distressed situations.

29.    At that same time, PNC began requiring MG to present PNC with a disbursement budget and capped the availability of credit under the RCSA to a roughly $28 million balance despite additional collateral being available under the RCSA' borrowing base calculation and no default having been declared.  Thereafter, a substantial (roughly 50% from the prior quarter) improvement in written sales in late April and May 2023 occurred as a result of actions taken under the new CEO, which in turn should have reduced the loan balance under the RCSA as those cash receipts were deposited and provided additional liquidity to MG. However, PNC declined to provide meaningful funding of this additional liquidity and limited its fundings to the disbursement budget originally modeled and presented to PNC (which assumed substantially lower anticipated sales), with the net effect resulting in a reduction of the RCSA balance by approximately $5,000,000 by June 26, 2023, the date of the recapitalization transaction.  Because the aforementioned higher written sales necessitated higher working capital needs and due to cash constraints imposed by PNC, MG was unable to adequately service obligations owed to vendors during this period, resulting in most, if not all, vendors requiring cash-on-delivery terms, and in many vendors refusing to provide products or services unless payment on past-due amounts were also made.  Those actions restricted the ability to obtain raw materials resulting in periodic manufacturing shutdowns and in further delays in delivery of finished goods to customers.

30.    During the three-week indication of interest solicitation period being conducted by Imperial, MG received interest from over 20 parties, with five expressions of interest from potential going-concern purchasers and engaged in extensive negotiations and due diligence activities with two potential going concern purchasers.  MG believed a going-concern sale maximized the value available for PNC and unsecured creditors, including but not limited to vendors, suppliers, employees, and customers.  During this accelerated process, the management

team presented transformation plans that outlined a rapid path to business improvements that were attractive to buyers but required cash to achieve. However, PNC's ever-tightening timelines and parsimonious advances prevented MG and CRHI from pursuing a going-concern sale. Instead, due to PNC's refusal to provide the funding needed for such a process—despite ample availability under the RCSA—MG did not have the financial runway to pursue in earnest going-concern bids nor even to contact the most relevant strategic parties who would have an interest in such a transaction. Eventually, MG received a proposal from SB360 Capital Partners ("SB360"), which provided for an orderly liquidation of the Debtors' assets.  PNC initially found this proposal to be acceptable, but ultimately rejected the proposal in favor of a recapitalization by SG-TMGC.

31.     During this timeframe, MG's management team, led by its new CEO, were developing a plan whereby MG would continue its operations and restore its business.  Discussions were held with The Stephens Group that resulted in an agreement between SG-TMGC and PNC, which included a $20 million equity infusion by SG-TMGC and resulted in the Fifth Amendment. This $20 million equity infusion was coupled with $5 million of incremental liquidity from PNC made available through an increase in the availability under the terms of the RCSA, along with an approximately $1 million elimination of a letter of credit required by a landlord, with such aggregate financing providing new liquidity to MG totaling $26 million. This additional investment supported management's plan to return MG to profitability, while simultaneously bringing vendors current on past due payables (coupled with structured repayment terms negotiated with many of the vendors), resolving the customer deposit overhang by completing all outstanding customer orders in a systematic manner, returning to normal delivery lead times of less than 8 weeks and accomplishing a number of other improvements to MG.  The cumulative effect was to position the company on a stronger foundation. The financial forecast that supported

SG-TMGC's investment projected Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $0.8 million, $8.0 million and $15.0 million in fiscal years 2023, 2024 and 2025, respectively.  The forecast was believed to be well within reach for MG based on its sales levels, industry standard EBITDA margins and on the company's own historical profit achievements.  Management also had a more aggressive plan that could have achieved better results, but required more investment and a favorable economic environment.  MG, SG-TMGC and PNC were all aware and had explicit conversations that to accomplish this forecast, MG would need full access to the RCSA provided by PNC, with borrowings under the credit facility increasing to roughly $20 million (out of the $28 million of projected availability).

32.    As part of the negotiations between the Equity Sponsors and PNC, a day before the anticipated closing of the June 26, 2023 recapitalization, the Equity Sponsors asked PNC to agree to reduce its "Minimum Availability Covenant" under the contemplated amendment to the RCSA from $4 million to $1 million.  Ultimately, the parties agreed to a Minimum Availability Covenant of $1.25 million.  The reason for this last-minute change was to address any concern regarding a fully adequate runway necessary to support the turnaround plan being contemplated, modeled and agreed to between all the parties and add more capital availability, given an uncertain economic outlook.

33.    MG, its financial advisors and its Equity Sponsor believed the turnaround plan was a reasonably funded plan and commenced with the closing of the June 26, 2023, recapitalization.

34.    The $20 million equity infusion was fully and highly negotiated by the parties with the entire funding predicated on PNC ultimately maintaining a similar level of exposure required under the RCSA as prior to the funding available before the steep restriction of

disbursements by PNC, but with improved financial stability and value-maximizing performance. The construct was such that the equity infusion would be used to substantially reduce the loan balance under the RCSA, thereby creating liquidity equal to or greater than the amount of the paydown. Quite simply, the loan balance would be paid down to approximately $3 million, and the entire source of funding for MG would be its ability to draw on the RCSA back up to a maximum of $28 million. This was particularly important given the pressure exerted on the company through the restrictions of the disbursement requests: vendors had been extremely stretched, employees stressed and customer deliveries curtailed. All parties, including PNC, understood the need for this capital to be applied for the purpose of lowering backlog, improving operations, addressing customer service issues and increasing profitability. All models reviewed and agreed to with PNC showed this very dynamic of cash flows playing out and was essential for MG to fulfill its obligations as a going concern.

35.     On July 10, 2023, MG reacted to an inquiry of interest (as expressed from an investment banker) from a major competitor with respect to a purchase of the company. It was concluded that, even though the recapitalization had recently occurred, MG should engage in conversations and accordingly prepare materials for their consideration. An NDA was executed with the party on July 12, 2023, confidential materials were assembled and delivered on July 24, 2023, and a review was commenced.

36.     Then, on July 14, 2023, following the dramatic reduction in the balance due to PNC sixteen days earlier, PNC sent MG the Fourth Notice of Events of Default and Reservation of Rights (the "Fourth Notice"), which alleged non-monetary defaults for failure to deliver a compliance certificate for May 2023; for failure to deliver a variance report for May 2023; and for failure to deliver a 13-week financial forecast.

37.    MG supplied the information required that was the basis for the alleged non-monetary defaults cited in the Fourth Notice within two hours of receipt of the Fourth Notice. Notably, the June 26, 2023, recapitalization closing documents and due diligence materials provided to PNC contained relevant, current information as of June 26, 2023, contemporaneous with those claimed due under the RCSA as amended that were the basis for the alleged non-monetary defaults. Following the Fourth Notice, PNC began severely limiting MG's access to advances under the RCSA and forced MG to seek daily approval for advances, stating that all advances would be in PNC's sole discretion. In essence, PNC decided what MG could and could not pay despite availability under the RCSA but for the alleged non-monetary defaults.

38.    On July 21, 2023, despite the company being "better than plan" on cash, PNC notified MG that PNC would not honor its thirteen-week forecast and would not allow the debt under the RCSA to rise above its current level.  MG explained it could not operate under those circumstances and it would be forced out of business by PNC unless they relented and allowed the company access to the substantial availability under the RCSA.

39.    Starting July 24, 2023, PNC began rejecting certain advance amounts requested by MG at PNC's sole discretion.  That same day, PNC also stated it would not allow any advances beyond payroll and taxes and demanded that MG refinance the RCSA on or before August 16, 2023, or PNC would accelerate the Obligations under the RCSA and begin liquidating its collateral. MG urged PNC to allow MG to seek a refinancing in an orderly fashion given that the debt level of the RCSA was at a historical low following the $20 million paydown.  In fact, at such date there was $18,800,000 in excess availability under the RCSA's most recent borrowing base certificate submitted by MG. Once again, similar to the going concern sale process mandated

by PNC with Imperial, an artificial deadline was established to complete an intricate financing in three weeks' time.

40.    Despite PNC's assertions, MG had a reasonable basis to believe PNC was not going to force MG out business under the circumstances that existed with the substantial paydown that had just occurred, nothing more than non-monetary defaults that were addressed within hours of such declaration of default, and the $18 million in borrowing capacity that existed under PNC's own borrowing base calculations.  Therefore, MG continued in good faith to operate its business as best it could under the circumstances to preserve going concern value such that PNC could be refinanced out or a new agreement could be reached between PNC and the Equity Sponsor to address the claimed defaults.  And in fact, PNC was itself hopeful, having unilaterally forced the issue, that a refinancing could occur and the business could move forward with a new lending relationship.   Additionally, the conversation was now ongoing with respect to the competitor interested in acquiring the business as a going concern.

41.    MG again commenced refinancing discussions with the limited universe of parties who were viewed by MG management, the MG board of managers and/or Riveron as potentially having interest in such a refinancing.  Over a several week period, fourteen (14) potential lenders were contacted, eight (8) of whom signed non-disclosure agreements and were granted access to a robust online dataroom with information pertinent to their evaluation of MG.  This rushed process, during which another furniture company suddenly closed, causing ripples of concern throughout the industry, resulted in one (1) party submitting a preliminary term sheet that was subsequently withdrawn after this party was unwilling to negotiate proposed terms to better align with MG funding needs.    In fact, the terms offered in the preliminary term sheet provided less availability than MG had under its facility with PNC.  After this rushed and forced

refinancing process failed to deliver a viable solution, on August 18, 2023, SG-TMGC again submitted a proposal to PNC that provided for a resolution to their claimed non-monetary defaults, reduced the exposure PNC would ultimately take relative to the RCSA that had been amended and agreed to less than two months prior, and provided for an additional injection of capital by the equity sponsor of up to another $10 million to continue MG as a going concern.  PNC unilaterally rejected that proposal, rejected MG's request to conduct an orderly sale process, and pushed for liquidation even though it had engineered its loan balance down to $9.8 million at the date of such rejection. The net effect was that customer deposits made in good faith were swept by PNC, and the ability to fund vendors and other ongoing needs were choked off.

42.    Concurrent with the refinancing discussions, dialog between the investment banker and the competitor continued regarding a going concern purchase of the business.  The NDA was expanded at the request of the competitor to enable the participation of an additional senior officer of the competitor to evaluate the materials, supplemental materials were provided as a result of the competitors additional data request, and a call was held between the investment banker and key members of the competitor's senior management team and a board member to further discuss their interest, with such interest being reflected back to MG. MG and the investment banker concluded that it would make sense to add other high quality strategic buyers to the process and the investment banker submitted the names of six additional strategic candidates that he believed would have a potential interest in acquiring MG.  An engagement letter to conduct such process was also submitted.

43.    By the last week of August, PNC refused to advance any funds to MG for any reason even though it had continued to sweep incoming funds—primarily from deposits paid

by customers for new orders—to pay down the balance under the RCSA and over the objection of MG, which sought the segregation of customer deposits given PNC's conduct.

44.     As PNC strangled MG's cash flow and then refused to advance any funds, MG revisited the bid provided by SB360.  PNC refused to provide the same runway for the Debtors to pursue a going-concern sale transaction and refused to provide MG with the cash flow needed for MG to continue operating its business, only weeks after PNC was paid down roughly $20 million of the RCSA and entered into the Fifth Amendment.

45.     On or about August 25, 2023, based on PNC's conduct, including restricting advances, and the breakdown of other viable financing alternatives, MG ceased taking any deposits from customers the moment MG believed in good faith that it would no longer be able to fill new orders for which a customer paid a deposit. As all proposals were rejected by PNC, and, with no source of cash, MG provided notice as required by the Worker Adjustment and Retraining Notification Act on August 26, while maintaining retail store operations as a vehicle to generate cash through anticipated inventory sales.

46.     Based on indications the SB360 process was favored by PNC, MG brought back its retail force in an effort to prepare for converting inventory to cash at retail prices upon assurances employees' wages would be advanced by PNC.  PNC did not pay these added wages, and, worse, would not even release funds withheld from employee paychecks for employee medical, dental, vision and 401(k) withholdings for August such that those benefit providers could be paid and keep such benefits in force.

47.     On August 26, 2023, the investment banker was notified by MG of the new developments such that the potential acquirer understood the change in conditions and conversations for the purchase of MG as a going concern were ceased.

48.    Subsequently, on or about September 1, 2023, PNC accelerated all Obligations it alleges are due and continued to refuse to provide any advances under the RCSA, other than limited sales taxes.

49.    Despite the shutdown of MG's operations, MG and SG-TMGC believe that this Chapter 11 Proceeding will realize and maximize the value of the Debtors' operations and assets for the benefit of the Debtors' creditor body and will additionally preserve the Debtors' claims against PNC.

50.    Ultimately, this Chapter 11 Case will prevent a rush to the courthouse by the Debtors' various creditor constituencies—a process that will inevitably create winners and losers. Instead, this Chapter 11 Case will provide the structure and breathing spell to allow the Debtors to engage in an orderly liquidation and sale process to realize maximum value for its assets. This Chapter 11 Case should allow MG's brand to survive; its facilities to continue operations under new management and ownership; its workforce to find new work and placement with any of the various parties interested in MG's highly skilled and expertly trained employee base; and will maximize the recoveries of MG's creditors and stakeholders.

51.    First, the Debtors anticipate continuing its dialogue and negotiations with SB360 and other suitors that have expressed an interest in the company's assets to maximize the value of its current inventory and provide for as orderly a sales process for such inventory as possible. Second, the Debtors have engaged Stump & Company ("Stump") as its consultant and investment banker to market and sell the Debtors' assets, including its inventory, its retail store lease interests, its manufacturing and distribution center lease interests, its access to its former workforce, and its intellectual property and branding, among other assets. Stump is a privately held

mergers and acquisitions advisory firm started fifty-one years ago, and since then, has participated in more than 400 transactions across the globe.

52.    Relevant to the Debtors' operations, Stump is located in Charlotte and, as a group is entirely focused on home furnishings and décor, has been involved with and worked for several industry stalwarts, which have a rich, thriving history in western North Carolina. In fact, principals of Stump who will work with the Debtors have spent countless hours in MG's facilities in Taylorsville, North Carolina, over the years and know one of the founders of MG, Mitchell Gold, through both parties' deep roots and ties to North Carolina's furniture industry.

53.    As of the date of this Declaration, Stump has identified roughly twenty prospective buyers for MG's manufacturing operations; roughly ten prospective buyers for MG's retail operations; and nearly thirty additional prospective buyers for certain discrete categories of MG's assets. Seventeen of these prospective buyers have contacted Stump to express their interest in certain of MG's assets. Further, numerous inquiries have come into employees, managers and equity holders of MG expressing interest in the assets of the business.

54.    Without the orderly process that can only be accomplished through this Chapter 11 Case, the value to be derived from the Debtors' assets—and the interest already generated in the same—will be lost, and with it, MG's brand, its goodwill, and the recoveries available for much of the Debtors' creditor constituencies, including most importantly, its customers and employees.

## IV.    First Day Motions

55.    Concurrently with the filing of this Chapter 11 Case, the Debtors have filed the following motions:

       a.    Debtor's Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use

of Cash Collateral Pursuant to 11 U.S.C. § 363, And (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C);

b.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor Certain Customer Practices and Authorize Developing the Merchandise Retrieval Process, (II) After Title is Determined, Granting Limited Relief from the Automatic Stay, and (III) Granting Related Relief;

c.      Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief;

d.      Debtors' Motion for Interim and Final Orders, pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief;

e.      Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and (B) Pay All Obligations with Respect Thereto; and (II) Granting Related Relief;

f.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations and (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Prepetition Taxes and Related Obligations;

g.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay (A) Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief;

h.      Debtors Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Their Bank Accounts and Existing Business Forms, and (D) Implement Changes to the Existing Cash Management System as Necessary; (II) Waiving Certain Requirements of the U.S. Trustee's Operating Guidelines; and (III) Granting Related Relief;

i.      Debtors' Application for Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent; and

j.      Debtors' Motion for Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases.

36.      The facts set forth in the motions are incorporated herein in their entirety. The Debtors have tailored their requests to seek relief necessary in the first two weeks of these chapter 11 cases to minimize further disruption to their business and a potential SB360 sale.

37.      I have reviewed each of the first day motions and am familiar with the content and substance contained herein.  The facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on other members of the Debtors' management and the Debtors' advisors, and I can attest to such facts.  I believe that the relief requested in each of the first day motions listed above is (a) necessary to allow the Debtors to operate with minimal disruption and productivity loses during these chapter 11 cases, (b) is critical to maximize the value of the Debtors' estates, and (c) serves the best interests of the Debtors' creditors and other stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 12, 2023                                      /s/ *Dalton Edgecomb*
                                                                                Dalton Edgecomb
                                                                                Chief Restructuring Officer
                                                                                The Mitchell Gold Co., LLC
                                                                                SG-TMGC, LLC