## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE MITCHELL GOLD CO., LLC, *et al.*,[1] | Case No. 23-11385 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO HONOR CERTAIN CUSTOMER PRACTICES AND AUTHORIZE DEVELOPING THE MERCHANDISE RETRIEVAL PROCESS, (II) AFTER TITLE IS DETERMINED, GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, respectfully move (the "Motion") as follows:

### RELIEF REQUESTED

1. The Debtors seek entry of an order authorizing, but not directing, the Debtors to honor certain prepetition customers practices (collectively, the "Customer Practices") and implement the Merchandise Retrieval Process (as defined below). The Debtors will also seek at a final hearing on this Motion final determination of any disputes that may arise with respect to title or security interests in the products that are the subject of this Motion.

### JURISDICTION

2. United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these chapter 11 cases, along with the Debtors' federal tax identification numbers are: The Mitchell Gold Co., LLC (8942) and SG-TMGC, LLC (0248). The Debtors' addresses are, respectively, 135 One Comfortable Place, Taylorsville, North Carolina 28681 and P.O. Box 3417, Little Rock, Arkansas 72203.

Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order with respect to this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.  The statutory bases for the relief requested in this Motion are sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(m).

## BACKGROUND

5.  On August 31, 2023, debtor SG-TMGC, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. On September 6, 2023, debtor The Mitchell Gold Co., LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to manage their business and their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

6.  Additional detail regarding the Debtors, their business, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Dalton Edgecomb in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed concurrently herewith and incorporated herein by reference.

**THE DEBTORS' PREPETITION CUSTOMER PRACTICES**

7. The Debtors historically engaged in a number of practices to develop, support, and sustain a positive reputation with their customers and in the marketplace generally. The relief requested in this Motion is critical to the Debtors' post-petition sale efforts and maximizing the value of the Debtors' estates in two ways: (i) reducing customer claims against the estate at a value greater than that lost from potential liquidation of those customer-assigned goods, and (ii) taking actions that support brand value in disposition.

**I.   The Debtors' Retail and Wholesale Sales Operations**

8. In the ordinary course of their business, the Debtors sold finished products through two main mechanisms: retail sales and wholesale sales. As described in more detail in the First Day Declaration, the Debtors operated retail stores where customers (the "Retail Customers") could design and order custom furniture and other furnishings directly from the Debtors at the Debtors' retail locations (the "Retail Products"). Given the handcrafted and custom nature of the Debtors' Retail Products, the Debtors generally manufactured and ordered Retail Products to the specific requirements of each Retail Customer. After a Retail Customer's order was manufactured or received from the Debtors' wholesale suppliers, the Debtors would assemble multi-piece orders and inspect finished products. Following that, the Debtors would ship the finished Retail Products to a distribution center or third-party logistics company (each, a "3PL") that would coordinate with the Retail Customer for final delivery of the Retail Products.

9. The Debtors also manufactured and sold finished products (the "Wholesale Products" and together with the Retail Products, the "Finished Products") to wholesale brands and other home furnishing and design companies (the "Wholesale Customers" and together with the Retail Customers, the "Customers") for resale. Historically, the Debtors' Wholesale Customers

included large furniture brands like Restoration Hardware, LL Bean, and Jenni Kayne, as well as channels that serve hotels and other commercial uses. The Debtors would manufacture Wholesale Products according to the same quality assurance processes for Retail Products and ship the Wholesale Products either directly to the Wholesale Customers or to a distribution point at the customer's direction.

10. In the ordinary course of the Debtors' business, the Debtors also designed and manufactured furniture for made-to-order Customers (the "Made-to-Order Program"). While much of the Debtors' products were custom in nature, through the Debtors' "customer-owned material" program, the Debtors would manufacture furniture which required the use of Customer-supplied raw materials such as fabrics and leathers. Under these circumstances the Customer—typically a design company working on behalf of the ultimate retail purchaser—would purchase its own raw materials from third parties (the "Customer-Owned Material" or "COM") and provide the material to the Debtors for use in the production of the custom products.[2]

II. **The Effect of the Debtors' Pre-Petition Liquidity Constraints on the Debtors' Retail and Wholesale Sales Operations and the Debtors' Customers**

11. As a result of the Debtors' pre-petition liquidity constraints described in more detail in the First Day Declaration, the Debtors' facilities, distribution centers, and the 3PLs are currently holding significant amounts of Retail Products, Wholesale Products, Customer-Owned Material, and raw materials used in the manufacturing of Finished Products (the "Raw Materials").

---

[2] The Debtors generally ascribed no value to these Customer-Owned Material on their books and records. However, given the unique nature of these special fabrics and leathers, it is not uncommon for a Customer to have paid many thousands of dollars for the Customer-Owned Material before providing them to the Debtors.

12. Approximately $6.5 million worth (retail value) of Retail Products is being held at 3PLs awaiting delivery to specifically designated Retail Customers. During the manufacturing and logistics process, the products are assigned to specifically designated customers, who typically paid a retail price, including shipping costs, in advance. As stated above, after a Customer's Retail Product is received at a 3PL, the 3PL notifies the Retail Customer and then works with the Customer to arrange final delivery of the Customer's Retail Products.[3] As a result of the Debtors' pre-petition liquidity constraints, 3PLs have refused to arrange for delivery of the Retail Products located in the 3PL facilities to the Retail Customers. Retail Customers are typically aware of the approximate delivery date of their Retail Products, and many have contacted the Debtors and the 3PLs to learn that their Retail Products are ready to be delivered but the 3PLs are unwilling to arrange delivery.

13. Approximately $17 million worth (retail value) of Finished Products is being held at the Debtors' distribution center (the "Statesville Distribution Center") and factory (the "Taylorsville Factory" and together with the Statesville Distribution Center, the "North Carolina Locations") in North Carolina.

14. In addition, certain of the Finished Products were previously delivered to Jenni Kayne in satisfaction of a wholesale order, but were temporarily returned to the Debtors for adjustments (the "Jenni Kayne Inventory"). Jenni Kayne paid in full for the Jenni Kayne inventory. As a result of the Debtors' pre-petition liquidity crisis, the Debtors have been unable to deliver the Jenni Kayne Inventory.

15. Finally, as described in the First Day Declaration, the Debtors' pre-petition liquidity constraints forced the Debtors to cease their manufacturing operations. Accordingly, the

---

[3] Most Retail Customers pay in advance for the shipping costs of their Retail Products, including the fees associated with delivery from the 3PL to the Retail Customer's home or other location.

Debtors are unable to manufacture any of the orders in the Made-To-Order Program. Customers that placed orders through the Made-To-Order Program have contacted the Debtors and requested that the Debtors return their Customer-Owned Material.

16. The Debtors recognize that this merchandise is valuable to their Customers and want to honor the orders placed by their Customers. Honoring Customer orders is not only consistent with the Debtors' long history of excellent customer service, but is critical to maximizing the value of the Debtors' estates.

17. In order to honor their Customer Practices, the Debtors seek—following a determination of title or rights in customers where there are finished, identified products—to allow (i) Customers who paid in full for Retail Products and (ii) Customers that sent Customer-Owned Material to the Debtors to retrieve their merchandise by either (a) assuming the cost of shipping themselves, (b) retrieving their designated merchandise directly from the Debtors' various facilities or the appropriate 3PL or North Carolina Locations with any associated costs paid for by the Customer, including, for the avoidance of doubt, and costs of any necessary additional labor or independent contractors, or (c) another method as may be authorized based on adequate funding (this process, the "<u>Merchandise Retrieval Process</u>").

## BASIS FOR RELIEF

**I. The Court Should Authorize, but not Direct, the Debtors to Honor the Customer Practices and Develop the Merchandise Retrieval Process.**

**A. The Merchandise Retrieval Process is permissible under the Bankruptcy Code and the doctrine of necessity.**

18. Sections 1107(a) and 1108 of the Bankruptcy Code allow a debtor in possession to continue to operate its business. Further, section 363(c) of the Bankruptcy Code authorizes a debtor in possession to operate its business and to use property of the estate in the ordinary course of doing so without having to provide notice or obtain a court hearing. *See In re*

*Roth Am.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that "the framework of section 363 is designed to allow a [debtor in possession] the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight"). Continuing, renewing, replacing, initiating, and/or terminating customer programs in the ordinary course of the Debtors' business falls well within the scope of activities that sections 363(c), 1107(a), and 1108 of the Bankruptcy Code permit.

19. Moreover, the Debtors' Terms of Sale, attached hereto as **Exhibit A** (the "Terms of Sale"), include delivery and pick-up provisions, which provide that the "[c]ustomer agrees to accept delivery or arrange for pickup within 30 days of the order being available." Should the Customer fail to arrange for delivery or pickup, the Customers must pay a storage fee for up to three (3) months. The Terms of Sale also require the Customer to pick up the Finished Products within three (3) months. Thus, although the Debtors historically have arranged for delivery of Finished Products to Customers, Customers could elect individual merchandise pick-up in accordance with Debtors' Terms of Sale and ordinary business practices. The Terms of Sale do not address when title to the Finished Products passes from Debtors to Customer.

20. The Court may also authorize continuation or implementation of Customer Practices, other than in the ordinary course of business, under section 363(b) of the Bankruptcy Code which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This section authorizes a court to allow a debtor to satisfy certain prepetition claims. To do so, the Debtors must articulate "some business justification, other than the mere appeasement of major creditors." *In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

21. Section 105(a) of the Bankruptcy Code provides an additional basis to grant the requested relief. It authorizes a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

22. The well-established "necessity of payment" doctrine also supports the requested relief. That doctrine provides for payment of prepetition claims as necessary to maintain the continuity or going-concern value of a debtor's business. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine); *In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre- reorganization claims have been paid"); *In re Just For Feet Inc.*, 242 B.R. 821, 824 (D. Del. 1999) (recognizing "the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that the debtors "may pay pre-petition claims that are essential to continued operation of business"); *Ionosphere Clubs*, 98 B.R. at 176 (necessity of payment rule applies to chapter 11 debtors) (citing *Dudley v. Mealey*, 147 F.2d 268 (2d Cir.), *cert. denied*, 315 U.S. 873 (1945)).

23. Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going-concern value). The

doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence. *See In re Just for Feet, Inc.*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy the debtor's business by refusing to deliver new inventory on the eve of debtor's key sales season); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (Bankr. S.D.N.Y. 1987) (affirming order authorizing payment of prepetition wages, salaries, expenses and benefits); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agreed to provide postpetition trade credit).

24. While the Debtors do not intend to make any payments to Customers through the Customer Practices or the Merchandise Retrieval Process, satisfying Customer claims through the relief requested in this Motion is supported by the doctrine of necessity because failure to satisfy such claims will adversely impact the Debtors' goodwill and the value of the Debtors' estates. *See In re CoServ*, 273 B.R. at 497. The Debtors have determined, in the sound exercise of their business judgment, that implementing the Customer Practices and initiating the Merchandise Retrieval Process is critical to the success of the chapter 11 cases and maximizing the value of the Debtors' estates. Allowing the development of a plan for retrieval of designated merchandise will help preserve the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and stakeholders. It also benefits the estate by lowering potential claims by customers who paid in advance for goods that are now ready to be received by the customer, if not for the interruption due to this chapter 11 case.

### B. The Merchandise Retrieval Process is permissible under certain applicable state laws.

26. With respect to almost all of the Finished Products designated for Customers, the Debtors submit that either (i) title has already passed from the Debtors to the Customers, or (ii) in the alternative, the Customers have an equitable lien on the Finished Products such that the Merchandise Retrieval Process provides the most efficient method to dispose of the Finished Products.[4] The Debtors believe that the Retail Customers in particular likely have a paramount right and interest in the Retail Products.

27. As to Finished Products that have been paid in full and designated for Customers, the Debtors submit that the Finished Products are likely not property of the Debtors' estates because legal and equitable title has likely passed to its Customers under North Carolina law. Where there is no agreement for the passage of title, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." N.C. Gen. Stat. Ann. § 25-2-401(2). As stated above, the Terms of Sale do not address when title to the Finished Product passes. Further, the Terms of Sale provide that the "Customer agrees to accept delivery or arrange for pick up within 30 days of the order being available . . . . The Customer must arrange pick up or delivery no later than 3 months from the date of availability." Terms of Sale at 1. The Debtors submit that because title has passed to the Customers, the Debtors have no legal or equitable title to these Finished Products and they are not property of the estates. *See* 11 U.S.C. § 541  It is arguable that the finished goods, once they have left the Debtor's property, were in the process of being delivered and therefore the title was similarly passing from Debtor to customer.

---

[4]  To be clear, the Debtors are not seeking an adjudication of title disputes, if any, on an interim basis herein. The Debtors will reserve such adjudication for a final hearing on this Motion if necessary.

10

28. Alternatively, if title has not passed, an equitable lien arises under applicable state law for the benefit of a purchaser "where specific items of personal property were purchased by the customers, fully paid for by the customers, marked by the seller as belonging to the customers and were being held by the seller solely for shipment to the customers at no further charge to the customers." *In re Surplus Furniture Liquidators*, 199 B.R. 136 (Bankr. M.D.N.C. 1995); *see also In re Carolina Wine Co.*, 2009 Bankr. LEXIS 2156, at *11 (Bankr. E.D.N.C. 2009) (citing *In re Surplus Furniture Liquidators*); *Cooper v. BB Syndication Servs. (In re 222 S. Caldwell St., Ltd. P'ship)*, 409 B.R. 770, 790 (Bankr. W.D.N.C. 2009) ("A equitable lien arises either from (1) a written contract which shows an intention to charge some particular property with a debt or obligation, or (2) a declaration of a court of equity out of the general considerations of right and justice, as applied to the relations of the parties and the circumstances of their dealings.").

29. In *In re Surplus Furniture Liquidators*, the Court found that an equitable lien existed because (1) customers had selected one or more items from the showroom and paid for such items; and (2) the debtor had "tagged" the furniture as having been sold but retained possession to either deliver or ship the furniture. 199 B.R. at 139. As described above and like in *In re Surplus Furniture Liquidators* and its progeny, the Finished Products have been paid for by the Customers and have been specifically identified to be delivered or retrieved by the Customers. All of the Finished Products held at 3PLs that are the subject of this Motion, plus all of the Jenni Kayne Inventory, and the Customer-Owned Material are earmarked or "tagged" for designated Customers. In addition, the Debtors understand that the Retail Customers Jenni Kayne have fully paid for their designated merchandise, and the Customer-Owned Material were purchased by the

customers in the first instance. Thus, under applicable state law, these Finished Products belong to their designated Customers, not the Debtors.[5]

30. Whether the Finished Products are not property of the Debtors' estates or if they are, subject to the Customers' equitable lien, failure to honor the Customer Practices could subject the Debtors to liability that would (a) distract the Debtors' management from the orderly administration of these chapter 11 cases and (b) severely diminish the value of the Debtors' estates. It is critical to the Debtors' orderly liquidation process to develop and execute a plan for Customers to obtain possession of the Finished Products.

31. Where retaining the loyalty and patronage of customers is critical to successful chapter 11 cases, courts in this District routinely authorize the continuation of customer programs. *See, e.g., In re Achaogen*, Inc., Case no. 19-10844 (BLS) (Bankr. D. Del. April 16, 2019 and May 3, 2019); *In re Pernix Sleep, Inc.,* Case No. 19-10323 (CSS) (Bankr. D. Del. Feb. 21, 2019 and Mar. 22, 2019) (granting interim and final relief); *In re Orexigen Therapeutics, Inc.,* Case No. 18-10518 (KG) (Bankr. D. Del. Mar. 13, 2018 and Apr. 11, 2018) (same); *In re Dendreon Corporation,* Case No. 14-12515 (LSS) (Bankr. D. Del. Nov. 12, 2014 and Dec. 9, 2014) (same); *In re Savient Pharmaceuticals, Inc.,* Case No. 13-12680 (MFW) (Bankr. D. Del. Oct. 16, 2013 and Nov. 19, 2013) (same).

32. As noted above, the loyalty of the Debtors' Customers constitutes a part of the Debtors' value. Any failure to honor their Customer Practices may disrupt their Customers' ability to obtain possession of their Finished Products, thus causing to the Debtors to focus its limited resources on handling unnecessary claims against the estates to recover the Finished

---

[5] Moreover, prior to the commencement of these chapter 11 cases, PNC—the Debtors' prepetition secured lender—informed the Debtors that it would not include what it called "customer assigned" inventory in its borrowing base template.

Products. As a result, it would curb the Debtors' profitability and negatively impact the Debtors' chapter 11 sale efforts.

33. The commencement of these chapter 11 cases, and the circumstances surrounding them, has undoubtedly created apprehension on the part of Customers. As previously discussed, the damage that would result if the Debtors fail to honor their prepetition Customer Practices significantly outweighs any arguable harm to the Debtors' estates if such obligations are honored.

**II. When a plan is developed for the Merchandise Retrieval Process, a Limited Waiver of the Automatic Stay to Implement the Relief Sought Herein is Appropriate.**

34. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties-in-interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

35. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to the extent applicable, to permit the Customers to retrieve their merchandise pursuant to the Merchandise Retrieval Process described above after title is determined and a plan is developed for the Merchandise Retrieval Process. The Debtors believe that cause exists to modify the automatic stay after title is determined and a plan is developed for the Merchandise Retrieval Process for all of the reasons discussed herein. As discussed above, any failure to honor their Customer Practices may disrupt the Debtors' ability to make similar sales postpetition, and, as a result, could curb the Debtors' profitability and negatively impact the Debtors' chapter 11 sale efforts.

**WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

36. The Debtors also request that after title is determined and a plan is developed for the Merchandise Retrieval Process, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to preserve and maximize value for the estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

37. To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

**RESERVATION OF RIGHTS**

38. Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity, amount or priority of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim; (iii) a promise or requirement to pay any claim; (iv) a waiver of any claim or cause of action of the Debtors that exists against any entity; (v) a ratification or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; (vi) a waiver of limitation of the Debtors' rights under the Bankruptcy Code, any other applicable law, or any agreement; or (vii) an admission or concession by the Debtors that any lien acknowledged or satisfied under this Motion is valid, and the Debtors expressly reserves and preserves its rights to contest the extent, validity, or perfection, or seek avoidance of, any such lien.

## **NOTICE**

39. Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) counsel for The Stephens Group, LLC; (iv) counsel for PNC Bank, National Association; and (v) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary. No previous motion for the relief sought herein has been made to this Court or any other court.

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court enter the Proposed Orders granting the relief requested herein and such other and further relief as is just and proper.

| | |
|---|---|
| Dated: September 12, 2023<br>Wilmington, Delaware | Respectfully submitted,<br><br>**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>/s/  *Andrew R. Remming*<br>Robert J. Dehney (No. 3578)<br>Andrew R. Remming (No. 5120)<br>Daniel B. Butz (No. 4227)<br>Evanthea Hammer (No. 7061)<br>1201 Market Street, 16th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: rdehney@morrisnichols.com<br>          aremming@morrisnichols.com<br>          dbutz@morrisnichols.com<br>          ehammer@morrisnichols.com<br><br> - and -<br><br>**RAYBURN COOPER & DURHAM, P.A.**<br>C. Richard Rayburn Jr.<br>Matthew L. Tomsic<br>Suite 1200, The Carillon<br>227 West Trade Street<br>Charlotte, NC  28202<br>(704) 334-0891<br><br>*Proposed Counsel to the Debtors and*<br>*Debtors in Possession* |